[Civ. No. 9122.   Third Dist.   July 15, 1957.]

REDWOOD TURKEY HATCHERY, INC. (a Corporation), Appellant, v. MEADOWBROOK FARMS (a Partnership) et al., Respondents.

Franklin H. Tuttle and Thomas F. Sargent for Appellant.

Bowers & Sinclair for Respondents.

VAN DYKE, P. J.—This is an appeal from an order granting a new trial to defendants upon the ground of newly-discovered evidence material for the defendants which they could not with reasonable diligence have discovered and produced at the trial. Although the motion was made upon all statutory grounds (Code Civ. Proc., § 557), the order was specifically based upon the ground above stated.

Plaintiff and appellant, Redwood Turkey Hatchery, Inc., a corporation organized and domiciled in Minnesota, brought the action against Meadowbrook Farms, a copartnership, having its place of business in Placer County. By its complaint it alleged its corporate capacity as a Minnesota corporation and that it maintained no place of business within this state;

that on January 14, 1954, it had paid to defendants the sum of $500; that on the 23d day of February following it paid to defendants the sum of $7,000; that for these sums defendants agreed to deliver on or before February 28, 1954, 20,000 turkey eggs; that the eggs had not been delivered; that upon failure of delivery the plaintiff had demanded that the defendants deliver the eggs or refund the money paid on the purchase price thereof; that defendants refused to do either. Defendants answered, denying that the plaintiff had paid them said sums or any sum upon any agreement by defendants to deliver turkey eggs therefor; and affirmatively alleged that they had received the money, not from plaintiff, but from one Melbourne Dahmes; that Dahmes paid the funds to defendants to apply upon an indebtedness of Dahmes to defendants for turkey eggs theretofore delivered to him and for which he had not paid; that they had applied the funds so received upon Dahmes' account with defendants in accordance with his agreement that they do so. Upon these issues the cause went to trial. Dahmes, as a witness for plaintiff, of which corporation he was president and managing officer, testified that he had never owed anything to defendant; that the unpaid account for eggs delivered, upon which defendants had applied the sums received, was the debt of another Minnesota corporation known as Mixa Turkey Enterprises, Inc.; that he had negotiated the agreement alleged in the complaint with B. L. McIntyre who acted for the defendant copartnership, at a time when McIntyre was in Minnesota and after the Mixa Turkey Enterprises, Inc., had received and failed to pay for eggs shipped during the previous shipping season; that McIntyre knew or should have known from their conversations that Dahmes was dealing for plaintiff corporation in agreeing to purchase eggs from defendants; that the funds forwarded to defendants were the funds of plaintiff corporation and not the funds of either the Mixa Turkey Enterprises, Inc., or of Dahmes. McIntyre testified that he had negotiated with Dahmes concerning the prior shipments which were made during the shipping season in 1953; that he had then dealt with Dahmes personally, knowing nothing of any corporate entity; that Dahmes had failed to pay, although often pressed for payment; that in January, 1954, at the beginning of the next shipping season, he had visited Dahmes in Minnesota at a time when the.latter was operating a display booth at a turkey breeders and growers convention; that he had looked him up for the purpose of attempting to collect the money he owed defend-

ants; that Dahmes wanted to purchase more eggs during the coming season, but was told by McIntyre that defendants would not agree to ship any further eggs until they were paid for those Dahmes had already received; that if and when they were paid they would work out new arrangements for further shipments; that defendants would do no business with Dahmes until he had first paid what he owed them. McIntyre testified he knew nothing of the plaintiff corporation and did not deal with Dahmes as its agent.

It is apparent that among the issues were these: Was Dahmes or Mixa Turkey Enterprises, Inc., debtor to defendants for egg shipments in 1953? If Dahmes was debtor did he send money to defendants to pay his debt? Whose funds were sent? Was there a contract between plaintiff corporation and defendants concerning eggs to be shipped in 1954? It is equally apparent that the evidence was sharply in conflict on these issues.

Defendants had an alternative defense only briefly hinted at in their answer and consisting in a claim that both Mixa Turkey Enterprises, Inc., and plaintiff corporation were each the *alter ego* of Dahmes; that, therefore, the antecedent debt was in any event the debt of Dahmes, the funds were the funds of Dahmes and that defendants had a right to apply the funds to the old account of Dahmes. Mention of this alternative theory of defense was made during the trial from time to time, but the record discloses that McIntyre, who conducted all negotiations directly with Dahmes, testified in effect that he had no dealings with either of the corporate entities at any time and that the application of the funds was made upon their receipt by reason of express agreement to that end between himself and Dahmes. The defendants' efforts, such as they were during the trial, to present the *alter ego* theory were confined almost entirely to the cross-examination of Dahmes. The attorneys for plaintiff proved the corporate capacity of plaintiff and Dahmes testified concerning his relations with the two corporations, the following appearing from his testimony: That there were altogether three Minnesota corporations, the oldest being Mixa Turkey Hatchery, the chief figure in which was one Dick Mixa; that Dahmes first worked for that corporation; that Dahmes and Mixa purchased the assets of Mixa Turkey Hatchery; that Dahmes and Mixa organized Mixa Turkey Enterprises, Inc.; that stock to the par value of $1,000 was issued, one-half to Dahmes and one-half to his wife; that thereafter plaintiff corporation was organized, capital stock to the amount of $950 being issued, $450 to Dahmes, $450 to his wife, and $50

to one Joe Beran. Without going further into detail, it may be said that proof under the *alter ego* theory was scanty, whereas, though under conflict, defendants' proof through McIntyre that all of defendants' dealings had been personal with Dahmes was complete if accepted as true by the trial court.

The trial court adopted findings that the first $500 which was given to McIntyre in Minnesota was a payment on the old account; that the following $7,000 was taken from the funds of plaintiff corporation and the court concluded that there had been no right in the defendants to apply that sum to the existing indebtedness, whether that indebtedness be that of Dahmes personally or of Mixa Turkey Enterprises, Inc., as claimed by Dahmes. Judgment therefor was given against defendants in the sum of $7,000.

■ The rule to be applied in testing the granting of a new trial upon the ground of newly-discovered evidence is well settled. The granting or denying of a new trial rests in the discretion of the trial judge. ■ Though a claim of newly-discovered evidence is looked upon by the courts with distrust and with disfavor, that attitude operates in the trial courts and after that court has exercised its discretion and has granted a new trial appellate courts will leave the decision to stand unless it appears that the trial court has abused its discretion to the point that the granting of a new trial amounts to a miscarriage of justice. ■ We may say that ordinarily the issue of due diligence in preparation for trial, including the discovery of material evidence, raises factual issues and it is safest to abide by the ruling of the trial court upon the question of due diligence. (*Dasso* v. *Bradbury,* 39 Cal.App.2d 712 [104 P.2d 128].)

We have concluded from the whole record that the trial court's order granting a new trial ought to be affirmed. Most of the arguments made by appellant in its attack upon the new trial order have to do with an asserted failure on the part of respondents to use the discovery statutes in ascertaining in advance of trial the financial history of Dahmes and of the three Minnesota corporations and their relationship one to another. Probably that should have been done. Respondents did not take the deposition of Dahmes prior to trial and it is well argued they should have done so. They seek to excuse this lack by saying they assumed that Dahmes would testify truly at the trial, meaning that his testimony would not conflict with that of McIntyre. But this assumption was precarious in view

of the fact that plaintiff corporation, not Dahmes, was suing for a return of the money on allegations it had made a contract with defendants, that it had furnished its own funds for eggs to be shipped under the agreement and that it was entitled to recover, because defendants wrongfully breached their contract and kept the funds paid them thereunder.

█ It is the duty of litigants to diligently prepare cases for trial and ordinarily they will not be allowed to gamble on the result of a trial by presenting one theory and then if judgment go against them get a new trial in order to try again for a favorable result under a different theory. █ Nevertheless, we think the trial court could properly grant a new trial in this case. The evidence defendants alleged they discovered after the trial and upon which they based their motion was generally to the effect that the first of the three corporations had become insolvent; that the second corporation had conducted its business in the same plant, using the same employees and the properties of the preceding corporation and that there was little to inform those who dealt with it that a change of any sort had taken place; that it too had become insolvent; that the plaintiff corporation was then formed and continued business at the same stand and with the same personnel; that both the corporations last organized issued only small amounts of capital stock and that plaintiff corporation did business without assets and by a sort of rental arrangement with Dahmes who owned the property and plant used in the plaintiff corporation's business. Dahmes in another trial in Minnesota had testified as follows: Mixa Turkey Enterprises, Inc., was Dick Mixa and myself; he had owned the Mixa Turkey Hatchery; when I came in with him I bought everything and he worked for me; Mixa Hatchery still exists, but without assets; I bought the assets; then I organized a new corporation with Mixa in it, called Mixa Turkey Enterprises; that corporation is still in existence; when Mixa resigned I began doing business as Redwood Turkey Hatchery, and brought in another fellow by the name of Joe Beran and he and I had it; Mixa Turkey Enterprises still exists, but it has no assets; neither does Redwood Turkey Hatchery, Inc.; all it ever had was accounts payable and accounts receivable; I own all of the assets; I do business under the corporate name, but the corporation has no assets; it paid me rent; we started the Redwood Turkey Hatchery, Inc., with Joe Beran as a partner, but I owned all of the equipment and still got rent.

Without going further into details as to the showing made

on the motion for new trial, it is clear from the record that the evidence as to the interrelationship between Dahmes and the plaintiff corporation and its antecedents was such as to corroborate materially the testimony of McIntyre that he had dealt throughout personally with Dahmes and had had no dealings with any of the corporations. The effect of the showing was not confined to the theory of *alter ego*, but affected directly the trial court's conclusion, that McIntyre for the defendants, had dealt with the plaintiff corporation. The trial court undoubtedly was impressed with the additional showing made and desired that the case be retried in order that such evidence could be received. It is, of course, easy to say that these matters could have been discovered prior to trial through the use of discovery proceedings, but in view of the fact that the investigation would have had to be made in Minnesota the trial court could properly consider that the effort and the expense were such as to excuse the failure to conduct fuller discovery proceedings in advance of the trial. We hold the order made did not constitute an abuse of judicial discretion, nor constitute a miscarriage of justice.

The order appealed from is affirmed.

Schottky, J., and Warne, J. pro tem.,* concurred.

A petition for a rehearing was denied August 12, 1957, and appellant's petition for a hearing by the Supreme Court was denied September 11, 1957.

*Assigned by Chairman of Judicial Council.